

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK** 0 9 CRIM.　　5 4 5

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA　　　　　:

　　　　　- v. -　　　　　　　　　　:　　**INFORMATION**

CHARLES W. BEE, JR.,　　　　　　　:　　**09 Cr.**

　　　　　　　**Defendant.**　　　　　:

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____ MAY 2 8 2009
DATE FILED: _____

## COUNT ONE
(Conspiracy)

The United States Attorney charges:

### Background

1.　　From 1984 through in or about October 2004, CHARLES W. BEE, JR., the defendant, was a Certified Public Accountant and a partner at a major international accounting firm ("the Accounting Firm"), which maintained its headquarters in Chicago, Illinois, and also maintained offices in various other United States cities, including New York, New York. BEE was a partner in the international tax group in the Accounting Firm's New York office and served as the National Director for International Taxation. From in or about July 1999 through October 2003, BEE was a member of the Accounting Firm's Board of Directors. From June 2000 until October 2003, BEE served as a Vice-Chairman of the Accounting Firm.

2.     In or about early 1998, the then-head of the Accounting Firm's national tax practice, who later became the Accounting Firm's Chief Executive Officer ("the CEO"), a co-conspirator not named as a defendant herein, formed a group devoted to designing, marketing, and implementing high-fee tax strategies for individual clients, often with law firms, investment firms, and financial institutions. Initially called the "Tax Sales Executive Group" and "Tax Products Group," the group's name was changed to the "Tax Solutions Group" or "TSG" (collectively hereafter, "TSG") in or about October 1999. The strategies marketed by the TSG included tax shelters that could be used by wealthy clients to eliminate, reduce, or defer taxes on significant income or gains. The tax shelters generally generated tax benefits — primarily losses or gain eliminations — that far outweighed the costs to enter into the tax shelters. The Accounting Firm touted the tax shelters internally as "value-added products" whereby fees far in excess of the normal hourly billing rate would be charged.

3.     From 1998 through October 2000, CHARLES W. BEE, JR., the defendant, led the TSG along with the CEO and Adrian Dicker ("Dicker"), another international tax partner from the Accounting Firm's New York, New York office, both co-conspirators not named as defendants herein. After Dicker's retirement in October 2000, until October 2003, BEE and the CEO led the TSG.

4.     From 1998 through October 2003, CHARLES W. BEE, JR., the defendant, was a member of the Accounting Firm's Tax Opinion Committee, a sub-group of the TSG that included the CEO and Adrian Dicker, co-conspirators not named as defendants

herein, until Dicker's retirement in October 2000. The Tax Opinion Committee analyzed tax shelter products for their potential use by the Accounting Firm and, ultimately, its clients, and reviewed templates of opinion letters to be utilized in connection with some of those tax shelters.

5.    CHARLES W. BEE, JR., the defendant, and his two co-leaders hand-selected the Accounting Firm partners who became members of the TSG. The CEO instructed the TSG members, other Accounting Firm partners, principals, and employees to canvass their respective client bases to determine potential prospects for sales of the tax shelter products — namely, wealthy individuals who had or were anticipating significant taxable income and/or gains for the particular tax year. In addition, the Accounting Firm utilized various alliances and relationships with other accounting and financial firms as referral sources for tax shelter product sales. Prospects were referred to TSG members, who would explain or "pitch" various aspects of a particular tax shelter and attempt to convince clients to implement that tax shelter or another. TSG leadership utilized a bonus structure, administered by Adrian Dicker, that handsomely rewarded Accounting Firm personnel involved in the design, marketing, and implementation of the TSG's transactions, including: the individual who referred the client to TSG members; the TSG member who pitched and closed the sale; other TSG members; and TSG management. In addition, the CEO doled out additional bonuses from the profits earned as a result of the sale of the tax shelter products.

6.     In June 2000, CHARLES W. BEE, JR., the defendant, and the other two TSG leaders obtained a compensation agreement from the Accounting Firm, retroactive to July 1, 1999, that paid to them 30% of the net profits of the TSG, which they shared equally. After Dicker's retirement in October 2000, BEE and the CEO split the 30% of the net profits of the TSG equally. Pursuant to those agreements, BEE earned more than $13.1 million in profits from the TSG's sale of tax shelters, in additional to his partner compensation and other bonuses, some of which derived from TSG tax shelter sales.

7.     At all times relevant to this Information, Altheimer & Gray ("A&G") was a law firm with its principal office in Chicago, Illinois. From at least 1996 until late December 1998, Lawyer A was a tax partner at A&G and head of its tax practice. On or about December 27, 1998, Lawyer A and two other A&G tax lawyers, Lawyers B and C, left A&G to establish the Chicago, Illinois office of Jenkens & Gilchrist, P.C., a law firm with offices in Dallas, Texas, and other locations. From in or about early January 1999 until in or about April 1, 2004, Lawyer A served as the managing shareholder of J&G's Chicago office and head of its Chicago tax practice. At all times relevant to this Information, the tax practice of Lawyers A, B, and C at A&G and J&G (collectively, "J&G") centered around the design, marketing, and implementation of tax shelters, including ones done with the Accounting Firm.

8.     Bank A, a foreign bank with United States headquarters in New York ("Bank A"), among other things, executed the financial transactions used in the Accounting

-4-

Firm's tax shelters that were designed, marketed, and implemented with J&G, as described below.

9.      In 1999 and 2000, Company A, an investment management firm in New York, New York ("Company A"), headed by Individual A ("Individual A"), executed financial transactions used in the Accounting Firm's tax shelters.

10.      At all times relevant to this Information, Outside Counsel A ("Outside Counsel A") was a major international law firm, with offices in New York and Washington, among other places.

11.      At all times relevant to this Information, Outside Counsel B ("Outside Counsel B") was a major international law firm, with offices in New York and Washington, among other places.

## The Short Sale and Short Options Tax Shelters

12.      The first shelter that was designed, marketed, and implemented by the Accounting Firm and J&G, with the assistance of Bank A, was known as the "short sale" transaction, which was typically implemented through three entities set up by J&G with the help of the Accounting Firm — a limited liability company ("LLC"), a partnership, and an S corporation — and typically involved the following preplanned steps engineered and implemented by the Accounting Firm, J&G, and Bank A for the client. As instructed, through the LLC, the client would first sell U.S. Treasury securities ("Treasuries") borrowed from Bank A (thereby generating cash proceeds for the client), and subsequently contribute

the proceeds to a newly-formed partnership, together with the obligation to close, or "cover," the short position through the purchase of replacement Treasuries. Although the contribution of the cash proceeds — in an amount that correlated to the tax loss sought by the client — was treated as a partnership asset (thereby increasing the client's tax basis in the partnership), J&G and the Accounting Firm took the position that the obligation to cover the short sale was not a liability for tax purposes because, notwithstanding the obligation to replace the Treasuries, the precise amount required to do so was not yet fixed or determined. With additional funds deposited into the partnership's account at Bank A by the client, the partnership would purchase either shares of stock or foreign currency. The short sale would then be closed, before year's end and usually after just a few days' duration, and, following liquidation or dissolution of the partnership (typically through transfer of the partnership assets to the S corporation), the client's purportedly stepped-up basis in the partnership would carry over to the assets of the partnership — the stock or the foreign currency. J&G and the Accounting Firm took the position that the subsequent sale of that stock or foreign currency, executed through Bank A, produced reportable tax losses for the clients. Those losses were approximately equivalent to the basis increase that had been produced through the transaction and to the tax losses that the client sought in the purchase of the tax shelter. The tax losses created by the tax shelter vastly exceeded any actual economic loss suffered by the client.

13.   A second and similar tax shelter designed, marketed, and implemented by the Accounting Firm and J&G, with the help of Bank A, was known as the "short options strategy," or SOS, and typically involved the following preplanned steps engineered and implemented by the Accounting Firm, J&G, and Bank A for the client. As instructed, the client, through a single member LLC, would purchase a long foreign currency digital option. The premium for the long option equaled the amount of the tax loss the client was seeking to generate. Simultaneously, also through the LLC, the client would enter into (sell) a virtually offsetting short foreign currency digital option. Bank A was the counterparty with the client on both options contracts. Like the amounts of the options, the cost, or premiums, to purchase those options were closely matched. The only money that the client was required to pay to Bank A was the difference between the long and short premiums ("the net premium"), which typically was one percent (1%) of the tax loss sought by the client.

14.   The client would then contribute the long and short options to a newly-formed partnership, which would result in an increase in the client's tax basis in the partnership equal to the cost of the long option. The Accounting Firm and J&G took the position that the short option would not be treated as a liability for tax purposes, and thus no adjusting decrease in the client's basis in the partnership would occur. As in the short sale tax shelter, the partnership would then purchase foreign currency or shares of stock, or have such assets contributed to the partnership. Thereafter, but before year end, the partnership would close the options positions. The client would then distribute the assets (with the

purportedly stepped-up basis) in the partnership to the S Corporation, which would cause a liquidation of the partnership.

15.     Through the S Corporation, the client would sell the stepped-up basis assets (again, stock or foreign currency), thereby generating, according to J&G and the Accounting Firm, ordinary and/or capital losses that vastly exceeded any actual economic loss suffered by the client.

16.     In addition to participating in the design, marketing and sale of the short options transaction with J&G and Bank A, the Accounting Firm also designed, marketed, and implemented a version of the short options tax shelter with Company A, which was generally reserved for clients with desired tax losses of more than $20 million.

## The Tax Fraud

17.     TSG members, including CHARLES W. BEE, JR., the defendant, arranged for the Accounting Firm to market and assist in the design and implementation of the short sale and SOS tax shelters with J&G. The Accounting Firm referred clients to J&G's Chicago office and to Bank A for implementation of those tax shelters. Both J&G and the Accounting Firm portrayed the tax shelters to clients as turnkey products with all-in fees paid to J&G and the Accounting Firm, with additional amounts to be paid to Bank A. J&G created the limited liability companies, partnerships, and S corporations used in the tax shelters. J&G also drafted and sent to the clients the letters of authorization and other documents utilized to execute the preplanned steps of the tax shelters, which steps the TSG

members and J&G monitored to ensure timely execution. J&G also issued a legal opinion letter concluding that it was "more likely than not" that the client would prevail in claiming the tax benefits from the tax shelter if challenged by the IRS.

18.    Bank A executed the short sale and options transactions for the tax shelters. The primary contact for the Accounting Firm/J&G tax shelter clients was an Investment Representative ("Broker A") in the Chicago office of the brokerage arm of Bank A. The Accounting Firm, under the supervision of a Chicago TSG partner, prepared the partnership and S corporation returns, and, for some clients, individual income tax returns, that reflected the tax benefits of the tax shelter transactions. The Accounting Firm refused to sign income tax returns reporting the tax shelter benefits unless and until J&G issued its opinion letter.

19.    The fees charged to the tax shelter clients were based on the amount and character of the tax losses sought by the clients. J&G generally charged the clients a fee of three per cent (3%) of the desired tax loss for capital losses, and a fee of four per cent (4%) of the desired tax loss for ordinary losses. J&G further agreed to pay the Accounting Firm 20% of the fee J&G received. The Accounting Firm also typically charged the client an additional fee of three to five per cent (3%-5%) of the desired tax loss. The client also was required to pay one per cent (1%) of the desired tax loss as the net premium to Bank A in order to purchase the options used in the short option transaction, and a fee to Bank A based on the amount of Treasuries involved in the short sale.

20.     CHARLES W. BEE, JR., the defendant, first learned of the short sale tax shelter in 1998 as a member of the TSG. Later, during the implementation period of the tax shelters, BEE knew and understood that, given the costs and fees paid by the clients to execute the short sale tax shelter, and the nature and duration of the short sale executed at Bank A, those tax shelters had no reasonable possibility of resulting in a profit.

21.     With regard to the SOS tax shelters, CHARLES W. BEE, JR., the defendant, and other TSG members knew that the options transactions implemented by Bank A for the clients of the Accounting Firm and J&G had a set pay-out structure — approximately a two-thirds' chance of losing the one per cent net premium paid to Bank A, a one-third's chance of doubling the net premium, and a purported remote or "lottery" chance of earning a larger multiple of the net premium. TSG members and others portrayed this purported lottery chance to the clients as a remote chance of making a significant amount of money. However, BEE and other TSG members knew that, due to the amount of the fees charged for the SOS tax shelters by the Accounting Firm alone, much less its and J&G's fees combined, any possibility of profit in the SOS transaction necessarily rested on the purported lottery feature. BEE and other TSG members knew and understood that such a minuscule possibility of profit would not meet the legal requirement that such a transaction have a reasonable possibility of a profit.

22.     CHARLES W. BEE, JR., the defendant, and other TSG members knew that the issuance of an opinion letter was necessary to the successful marketing of the tax

shelters. BEE and other TSG members reviewed a draft template legal opinion by J&G's Chicago tax lawyers for the SOS tax shelter and provided comments and edits to them with respect to the opinion. At that time, BEE and other TSG members knew that the true motivation behind the tax shelter was for the clients to obtain tax benefits. In fact, BEE knew and understood that TSG members pitched the tax shelters as ways for the clients to substantially reduce or eliminate taxes that would otherwise be due to be paid by the clients to the IRS. Moreover, the Accounting Firm, spearheaded by the CEO, made the sale of the tax shelter products a focal point of the Firm's aggressive "value added" product promotion activities, using a "Tax $ells" logo and other marketing hype, in addition to the TSG sales bonuses, to induce the Accounting Firm's personnel to generate additional tax shelter sales.

23. CHARLES W. BEE, JR., the defendant, and other TSG members knew that the J&G opinion letters utilized a series of false and fraudulent representations to support the legal conclusions therein, including the following: (a) the client entered into the purchase and sale of options for substantial nontax business reasons, including (i) to produce overall economic profits because of the client's belief that the foreign currency/U.S. Dollar exchange rate relationship would change; and (ii) the client's belief that the most direct way, with the most leverage, to realize gain from expected changes in currency prices was the purchase and sale of the options; (b) the client contributed the options and the shares to the partnership for substantial nontax business reasons, including, but not limited to, potential diversification of the risks of certain investments, the desire to co-invest as partners with the other co-partners,

and for the client's convenience; and (c) the client's contribution of his interest in the partnership to his S corporation was made for substantial nontax business reasons. In truth and fact, as BEE and other TSG members then knew, the clients had no substantial nontax business purpose for engaging in the various preplanned steps of the transaction.

24. In light of these false representations and the lack of any reasonable possibility of a profit in the short sale and SOS tax shelters, CHARLES W. BEE, JR., the defendant, and other TSG members knew that J&G's conclusion that the client "more likely than not" would prevail in claiming the tax benefits from the tax shelter if challenged by the IRS was bogus. Nevertheless, BEE and other TSG members approved the use of the J&G opinion letter, notwithstanding the inclusion of the false and misleading representations and the failure of the opinion genuinely to satisfy a "more likely than not" standard. They did so in order to obtain the lucrative compensation and bonuses the Accounting Firm was paying as a result of the sale of the tax shelters. BEE and other TSG members knew and understood that the purpose of the J&G opinion letter was to induce clients to purchase the tax shelters, shield the clients from possible imposition of penalties by the IRS, and provide the clients with a basis to defend against penalties should the IRS disallow the deductions. By helping tax shelter clients obtain false and fraudulent opinion letters, with the understanding and intent that those opinion letters would be presented to the IRS if and when the clients were audited, BEE, other TSG members, and J&G lawyers not only sought to undermine the ability of the IRS to ascertain the clients' tax liabilities, but also sought to undermine the

-12-

ability of the IRS to determine whether penalties should be imposed.

## Tax Harm Caused By the Fraudulent Tax Shelters

25.     Because the short sale and SOS tax shelters were executed simply to generate huge tax losses (and could not result in a profit, when viewed in light of the costs and fees involved), the tax shelters resulted in massive tax evasion caused by J&G and the Accounting Firm on behalf of their clients.  The tax shelters that the Accounting Firm implemented with J&G and Company A generated well over $1,000,000,000 of false and fraudulent tax losses, thus causing the evasion of well in excess of $200,000,000 in clients' taxes due and owing to the United States.

## Efforts to Conceal the True Nature of the Tax Shelters

26.     As a result of their awareness that the J&G tax shelters lacked reasonable profit potential and business purpose, and therefore were likely to be successfully challenged by the IRS, CHARLES W. BEE, JR., the defendant, and other TSG members developed a template consulting agreement to disguise the fact that the fees clients would be charged by the Accounting Firm were solely for the tax shelters.  The consulting agreement contained a false and fraudulent description of the nature and scope of the services to be rendered under the agreement, and deliberately omitted any mention of the tax shelter.  In truth and fact, as BEE, other TSG members, and J&G lawyers knew, the services to be rendered by the Accounting Firm under the consulting agreement and the fees referenced therein were solely for the implementation of the tax shelter.  This was done so that the

Accounting Firm and its clients could falsely tell the IRS that the fees were for services in addition to the tax shelter, and therefore only a portion of the Accounting Firm's fees should be counted when conducting a profitability analysis of the tax shelter.

27. In addition, CHARLES W. BEE, JR., the defendant, knew and understood that other TSG members prepared documentation that falsely portrayed the tax shelters as investment strategies with incidental, if any, tax benefits. TSG members created, disseminated, and papered their clients' files with documents that falsely and fraudulently ascribed investment motivations of the clients in entering the tax shelter transactions, when in truth and fact, as BEE and other TSG members knew, the reason of the clients for entering into the strategies was to substantially reduce or eliminate their income taxes. BEE knew and understood that this paperwork was prepared and included in the files of BDO clients with the intention of making it appear to the IRS that the main purpose of the clients for entering into the transaction was to make a profit on an investment, whereas, in truth and fact, the primary if not exclusive purpose was to generate a tax loss. BEE and other TSG members knew and understood that if the IRS learned about the true nature of the tax shelters, it would disallow the tax benefits generated by the transactions and reported on the tax returns filed by the clients.

## Statutory Allegations

28. From in or about early 1998 through in or about 2005, in the Southern District of New York and elsewhere, CHARLES W. BEE, JR., the defendant, together with

others known and unknown, unlawfully, willfully, and knowingly did combine, conspire, confederate and agree to defraud the United States and an agency thereof, to wit, the Internal Revenue Service of the United States Department of Treasury, and to commit offenses against the United States, to wit, violations of Title 26, United States Code, Sections 7201, 7206(1), 7206(2), and 7212(a), and Title 18, United States Code, Section 1343.

29.     It was a part and object of the conspiracy that CHARLES W. BEE, JR., the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did defraud the United States and the IRS by impeding, impairing, defeating, and obstructing the lawful governmental functions of the IRS in the ascertainment, evaluation, assessment, and collection of income taxes.

30.     It was a further part and object of the conspiracy that CHARLES W. BEE, JR., the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did attempt to evade and defeat a substantial part of the income taxes due and owing to the United States by themselves and various clients of the Accounting Firm, in violation of Title 26, United States Code, Section 7201.

31.     It was a further part and object of the conspiracy that CHARLES W. BEE, JR., the defendant, and his co-conspirators unlawfully, willfully, and knowingly would and did make and subscribe, and cause certain United States clients who participated in the Accounting Firm's tax shelter transactions to make and subscribe, United States individual, corporation, and partnership income tax returns for the years 1998 through 2002, which

returns contained and were verified by written declarations that they were made under the penalties of perjury, and which BEE and his co-conspirators did not believe to be true and correct as to every material matter, in violation of Title 26, United States Code, Section 7206(1).

32. It was a further part and object of the conspiracy that CHARLES W. BEE, JR., the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did aid and assist in, procure, counsel and advise the preparation and presentation under, and in connection with matters arising under, the internal revenue laws, of tax returns that were fraudulent and false as to material matters, in violation of Title 26, United States Code, Section 7206(2).

33. It was a further part and object of the conspiracy that CHARLES W. BEE, JR., the defendant, and his co-conspirators, unlawfully, willfully, and knowingly would and did corruptly obstruct and impede, and endeavor to obstruct and impede, the due administration of the Internal Revenue Laws, in violation of Title 26, United States Code, Section 7212(a).

34. It was a further part and object of the conspiracy that, from in or about 1998 until in or about October 2003, CHARLES W. BEE, JR., the defendant, and his co-conspirators, unlawfully, willfully, and knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, to wit, a scheme to defraud the IRS

through the design, marketing, and implementation of the fraudulent tax shelter transactions, and for the purpose of executing such scheme and artifice and attempting so to do, would and did transmit and cause to be transmitted by means of wire and radio communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, to wit, interstate telephone calls, faxes, and e-mails, in violation of Title 18, United States Code, Section 1343.

## Means and Methods of the Conspiracy

35.     Among the means and methods by which CHARLES W. BEE, JR., the defendant, and his co-conspirators would and did carry out the objectives of the conspiracy were the following:

a.     They would and did design, market, and implement false and fraudulent tax shelters, so that wealthy individuals could pay a percentage of their income in fees to the Accounting Firm, J&G, Bank A, and other participants in the tax shelters, rather than pay a substantially greater amount in taxes to the IRS;

b.     They would and did design, market, and implement tax shelters in ways that disguised the fact that the tax shelters were largely or exclusively tax-motivated and lacked substantial nontax business purposes;

c.     They would and did prepare and assist in preparing false and fraudulent documents to deceive the IRS about the true nature of the tax shelters, including but not limited to income tax returns, consulting agreements, transactional documents, opinion

-17-

letters, client file documentation, and correspondence with the IRS;

      d.     They would and did make false and misleading statements in connection with efforts by the IRS to ascertain the circumstances surrounding the design, marketing, and implementation of tax shelters, as well as the motivation behind the clients' participation in the tax shelters

      e.     They would and did cause damaging statements appearing in a report by Outside Counsel A about the Tax Solutions Group's practice to be stripped from the final report and would and did make false statements about the conclusions of Outside Counsel A to members of the TSG and the Accounting Firm's Board of Directors, in order to continue and encourage the lucrative sales of the TSG.

      f.     They would and did cause the Accounting Firm to hire Outside Counsel B in connection with the tax shelter designed, marketed, and implemented with Company A, would and did ask Outside Counsel B to review potential criminal liability on the part of the Accounting Firm, BEE, Adrian Dicker, and the CEO, co-conspirators not named as defendants herein, in the design, marketing, and implementation of the tax shelter implemented with Company A, and would and did give and cause to give false and misleading information to Outside Counsel B, and conceal the fact and nature of the engagement from the Accounting Firm's Board of Directors.

## Overt Acts

      36.    In furtherance of the conspiracy and to effect the illegal objects thereof,

CHARLES W. BEE, JR., the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.     On or about June 11, 1999, Adrian Dicker, a co-conspirator not named as a defendant herein, sent a memo to the then CEO of the Accounting Firm, outlining the roles that he and the other leaders of TSG would have as the "key drivers" of the tax products business line. Dicker further described that "[t]he key element of this business line is to design, market and implement tax products. Adrian Dicker and Charlie Bee would organize and drive this crucial part of the business."

b.     In or about late 1999 or early 2000, during a discussion about profit potential in the tax shelter transactions in light of the fees charged by J&G and the Accounting Firm, CHARLES W. BEE, Jr., the defendant, discussed with Lawyer A from J&G the disguising of the Accounting Firm's tax shelter fees through the use of a consulting agreement or engagement letter that falsely portrayed the nature and scope of the services to be rendered, and that deliberately omitted any mention of the tax shelter.

c.     In or about September 1999, Adrian Dicker, a co-conspirator not named as a defendant herein, after speaking to another accountant involved in the design, marketing, and implementation of tax shelters, introduced to and discussed with other TSG members a way to attempt to conceal the reporting of the losses generated by the tax shelters through the netting of gains and losses on a grantor trust tax return, instead of reporting the gains and the losses separately on the clients' individual income tax return.

d.  In or about September 1999, Adrian Dicker, a co-conspirator not named as a defendant herein, along with Michael Kerekes, a co-conspirator not named as a defendant herein and a Los Angeles-based TSG member, met with Client A.D., Client J.S., and representatives of an alliance firm to pitch the two Clients on an SOS tax shelter that could eliminate anticipated taxes the Clients expected to pay on their 1999 income.

e.  On or about October 28, 1999, Michael Kerekes, a co-conspirator not named as a defendant herein, signed and sent a consulting agreement to Client A.D. that falsely and fraudulently described the services to be rendered under the agreement as comprising:

> consulting services in conjunction with ongoing planning for [Client A.D.'s] trust's business interests, including planning for future operations and/or orderly termination and liquidation thereof, assisting [Client A.D.'s] trust and entities it controls in evaluating the various options and their consequences, providing numerical computations . . . to illustrate those consequences, coordinating with [Client A.D. and his trust's] legal counsel, estate planners and financial advisors to coordinate the resolution of matters relating to [Client A.D.'s] trust with other business, legal and financial matters, and such other services as [Client A.D.] may request that relate to the above-listed services.

The consulting agreement, which did not mention the tax shelter transaction, provided that Client A.D. would be required to pay the Accounting Firm $133,000 — approximately 2% of the $6.7 million tax loss sought by Client A.D.

f.  On or about November 15, 1999, a Chicago-based TSG member drafted a template letter to be sent to clients and placed in client files in order to provide false and fraudulent business purpose for the Accounting Firm's tax shelters. The letter provided:

"Dear [blank,] Just a short note to confirm that I've thought about the business and tax issues we've been discussing and concluded that you should contribute the investments to the partnership. Best regards, [Chicago TSG Member.]"

g.      In or about late 1999, a Detroit-based TSG member asked Broker A about the likelihood of a client receiving a lottery payout in a short options transaction. In response, Broker A stated in substance that if any client came close to hitting the lottery payout, Bank A could prevent that from occurring because Bank A was big enough and controlled both sides of the market.

h.      On or about March 14, 2000, Adrian Dicker, a co-conspirator not named as a defendant herein, e-mailed his comments on a J&G draft template SOS opinion letter to a Chicago-based TSG member.

i.      On or about March 22, 2000, J&G sent an invoice for $201,000 to Client A.D. as J&G's fee for the SOS tax shelter. J&G's fee equaled three per cent (3%) of the $6.7 million desired tax loss.

j.      On or about April 10, 2000, J&G sent a false and fraudulent opinion letter to Client A.D. in support of his SOS tax shelter.

k.      On or about April 13, 2000, CHARLES W. BEE, Jr., the defendant, Adrian Dicker, a co-conspirator not named as a defendant herein, and two lawyers for Outside Counsel B, participated in a conference call in which BEE and Dicker falsely advised the lawyers that the tax shelter transaction done with Company A had a significant

realistic possibility of profit.

l.       On or about April 15, 2000, Client A.D. signed and filed a false and fraudulent 1999 personal income tax return, which reported the losses from Client A.D.'s SOS tax shelter.

m.      On or about June 5, 2000, CHARLES W. BEE, JR., the defendant, and the other two TSG leaders, signed a compensation agreement with the Accounting Firm, retroactive to July 1, 1999, that entitled them to 30% of the net profits of the TSG, which they were to share equally.

n.      In the Fall of 2000, CHARLES W. BEE, Jr., the defendant, and the CEO of the Accounting Firm, a co-conspirator not named as a defendant herein, caused Outside Counsel A to strip damaging information from the final report regarding the practices of the Tax Solutions Group.

o.      On numerous occasions during 1999 and 2000, Broker A from Bank A implemented numerous foreign currency digital option positions for clients of Bank A, the Accounting Firm, and J&G, through Bank A's offices in New York, New York.

p.      In or about 2000 and 2001, CHARLES W. BEE, JR., the defendant, entered into a tax shelter to offset his income, which BEE knew was lacking in economic substance, for which BEE received an opinion letter from a law firm that he knew contained false and fraudulent representations.

q. On his 2000 and 2001 U.S. Individual Income Tax Returns, Adrian Dicker, a co-conspirator not named as a defendant herein, at the urging of CHARLES W. BEE, JR., the defendant, reported tax benefits from a tax shelter that was substantially similar to the SOS tax shelter executed for TSG clients by the Accounting Firm and J&G.

r. On July 31, 2002, Accounting Firm client H.F. made materially false and misleading statements to the IRS during a deposition relating to an audit of H.F.'s 1999 and 2000 income tax returns, which claimed losses from a J&G short sale transaction.

s. On October 24, 2002, a Memphis-based TSG partner made materially false and misleading statements to the IRS during an interview relating to the IRS's audit of Accounting Firm client H.F.

t. On August 9, 2002, TSG member Michael Kerekes, a co-conspirator not named as a defendant herein, made false and misleading statements to the IRS during a deposition relating to the audit of TSG Client B.A.

u. On December 10, 2002, TSG member Michael Kerekes, a co-conspirator not named as a defendant herein, made false and misleading statements to the IRS during a second deposition relating to the audit of TSG Client B.A.

v. On or about April 7, 2003, a Chicago-based member of the Accounting Firm's TSG faxed a letter to an associate attorney at J&G, which copied J&G Lawyer B, identifying tax shelter clients who needed "follow up" tax opinions in 2003 relating to new losses generated by the sale in 2002 of assets with stepped-up basis from tax shelter

transactions executed in earlier tax years. Those new losses were being reported by Accounting Firm clients on income tax returns for the 2002 tax year.

w.     From on or about November 24, 1999, to on or about January 3, 2003, the Accounting Firm paid CHARLES W. BEE, JR., the defendant, approximately $13,109,925 in TSG profit distributions.

x.     From on or about June 15, 1998 to on or about January 3, 2003, the Accounting Firm paid CHARLES W. BEE, JR., the defendant, approximately $6,897,235 in bonuses.

y.     On or about October 18, 2003, Accounting Firm Client W.H. filed a 2002 U.S. Individual Income Tax Return that reported false and fraudulent tax losses derived from his personal SOS tax shelter.

z.     On or about February 2, 2005, CHARLES W. BEE, the defendant, made materially false and misleading statements during a deposition in a tax shelter case pending in the U.S. Court of Federal Claims.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Tax Evasion)

The United States Attorney further charges:

37.     The allegations set forth in Paragraphs 1-27, 35, and 36 of this Information are realleged and incorporated by reference as though fully set forth herein.

38.     Among the individuals Adrian Dicker, a co-conspirator not named as a defendant herein, participated in pitching a tax shelter product was Client A.D., who, at all times relevant to the Information, resided in the San Diego, California area. Client A.D. was referred to Dicker by an accounting firm that participated in an alliance with the Accounting Firm. Client A.D. was the Chief Financial Officer of a firm of which Client J.S. was the Chief Executive Officer.

39.     In or about September 1999, Dicker, along with Michael Kerekes, co-conspirators not named as defendants herein, met with Client A.D., Client J.S., and representatives of the alliance firm to pitch Clients A.D. and J.S. on an SOS tax shelter to eliminate the taxes they expected to owe for the 1999 tax year, which for Client A.D. included taxes on income earned from a recent sale of appreciated stock shares to Client J.S. Kerekes outlined the various steps of the tax shelter, including the use of a financial transaction executed through Bank A.

40.     Following Client A.D.'s decision to proceed with the tax shelter transaction, Michael Kerekes, a co-conspirator not named as a defendant herein, caused an engagement letter to be sent to Client A.D. in late October 1999, requiring him to pay the Accounting Firm $133,000, or approximately 2% of the tax loss Client A.D. was seeking, as the Accounting Firm's fee for Client A.D.'s SOS tax shelter. In the letter, Kerekes falsely described the nature and scope of services to be rendered under the engagement letter as services related to "ongoing planning for [Client A.D.'s] trust's business interests," as

-25-

detailed in paragraph 31.e. above, whereas, as Kerekes well knew, the services to be rendered were solely for the execution of the SOS tax shelter.

41.     Client A.D. set up financial accounts with Bank A through Broker A and, on or about November 16, 1999, Client A.D. executed a $6.7 million SOS transaction through Bank A's foreign exchange trading desk in New York, New York.

42.     In or about November 1999, Michael Kerekes, a co-conspirator not named as a defendant herein, sent Client A.D. a series of false and misleading letters designed to bolster the appearance that Client A.D. had a genuine investment purpose for purchasing the options transaction and a business purpose for entering into the various steps of the SOS tax shelter, when, Kerekes well knew, Client A.D.'s sole purpose in engaging in the tax shelter was to eliminate taxes due on his 1999 income.

43.     On or about November 19, 1999, Lawyer B sent to Client A.D. certain paperwork relating to the execution of Client A.D.'s short options transaction.

44.     On or about March 22, 2000, J&G sent an invoice in the amount of $201,000 — equaling 3% of the fraudulent tax losses to be generated — to Client A.D. as J&G's fee for the SOS tax shelter.

45.     On or about April 10, 2000, J&G sent Client A.D. a "more likely than not" opinion letter in support of his SOS tax shelter that contained false and fraudulent representations.

### Statutory Allegations

46.     From in or about September 1999 through in or about August 2000, in the Southern District of New York and elsewhere, CHARLES W. BEE, JR., the defendant, unlawfully, willfully, and knowingly did attempt to evade and defeat a substantial part of the income tax due and owing by Client A.D. to the United States of America for calendar year 1999 by various means, including, among others, aiding and abetting and causing (a) Client A.D. to engage in an SOS tax shelter that BEE knew had no reasonable possibility of generating a profit; (b) Client A.D. to use the SOS tax shelter to generate approximately $6,700,000 in false and fraudulent tax losses that BEE knew could not properly be deducted on Client A.D.'s tax returns; (c) false and fraudulent documents to be created, sent, and placed in Client A.D.'s file that were intended to bolster the appearance of an investment purpose for the SOS tax shelter; and (d) Client A.D. to sign and file a false and fraudulent U.S. Individual Income Tax Return, Form 1040, for calendar year 1999, which was filed with the IRS on or about April 15, 2000, which substantially understated Client A.D.'s taxable income and tax due and owing.

(Title 26, United States Code, Section 7201; Title 18, United States Code, Section 2.)

### COUNT THREE
(Perjury)

The United States Attorney further charges:

47.     The allegations set forth in Paragraphs 1-27, 35, and 36, of this

Information are realleged and incorporated by reference as though fully set forth herein.

48. On or about February 2, 2005, in the Southern District of Florida, CHARLES W. BEE, JR., the defendant, having taken an oath to testify truthfully in a proceeding before and ancillary to a court of the United States, to wit, the United States Court of Federal Claims, unlawfully, willfully, knowingly, and contrary to such oath, did make false material declarations, to wit, he gave the following underlined false deposition testimony in the matter of Jade Trading, LLC v. United States, Case No. 03-2164-T:

> Q. Could you tell me what the "options spread strategy" was? . . . Options spread strategy, I just want to use the correct term.

(a)
> A. <u>Excellent. We had a limited role, because the transaction, the strategy, and actually I think it's better characterized as the investment idea, was brought to [the Accounting Firm] by [Individual A], a registered investment advisor, an experienced currency trader who owned a company called [Company A]. [Individual A] was introduced to [the Accounting Firm], and I don't remember who introduced him.</u>

> \* \* \* \* \*

> Q. What was the idea that [Individual A] presented?

(b)
> A. <u>He described it as an opportunity to invest in hedge funds for a client, an opportunity that had very significant profit potential, both as to the original option and as to the hedge fund operations themselves. And along with that significant profit potential tax advantages could accrue. And he described in very general terms the tax advantages that could accrue, you know, given a whole series of events that could take place in a year or two years.</u>

And he described in great detail the functioning of the two options and how they would work.

He described how it was conceivable that the tax result of contributing each of the two options into a partnership would result in only the purchased option creating basis in the partnership.

He described the idea that the sold option – because it was firmly – I mean, it was very likely to expire without creating any actual liability to repay, couldn't be a liability for tax purpose.

He said that the additional basis, you know, in the partnership could then be available potentially for a client, for an investor, should they dispose of the partnership or property that had been in the partnership. That's the generalities of the discussion that we had. But he did not have – [Individual A] is not a tax professional, and consequently he had no other documentation or research analyses or memoranda to provide us. So we had to say, well, that's quite interesting. We had to decide whether what he saying made any sense.

Q.    Was this the first time you had ever heard or considered this potential tax benefit or tax advantage?

A.    To the investment?

Q.    Yes.

(c)    A.    Yes.

* * * * *

Q.    Did [the Accounting Firm] negotiate fees between investors and [Company A]?

(d)    A.    No, not to my knowledge.

-29-

* * * * *

Q.    Was the options spread strategy a capital gain eliminator?

(e)    A.    <u>I don't use that term. So, if you're asking me if I considered it a capital gain eliminator, no, I did not.</u>

* * * * *

Q.    Okay. This appears to be an e-mail from Charles Bee to the Tax Solutions Group dated November 30, 1999, regarding the subject of "Forward Redemption letter," forward as if the e-mail were forwarded. I think that's how I'm reading it.

Mr. Bee, the third sentence says, "The letter could go out now for most people assuming they have been in the partnership for at least 60 days." Do you know what the significance of the 60 days is?

(f)    A.    <u>No.</u>

Q.    The next sentence says, "Issues relating to capital gains and losses must be dealt with immediately." Do you know why?

(g)    A.    <u>No.</u>

* * * * *

Q.    And which of these listed "solutions," I say that in quotes, "solutions," was not an actual tax solution?

(h)    A.    . . . <u>Capital gains eliminator, as I've said, a misnomer. But also the pricing of it, the formula indicating the pricing of it is erroneous.</u>

Q.    Okay. So there was a capital gain eliminator called something else, but the price –

(i)      A.     Well, the whole use of the term "capital gain eliminator," is, as I've said before, a complete misnomer.

Q.     Okay, but to the extent that there was something classified as that, it was priced how?

(j)      A.     Well, it says based on percentage of the tax savings, and this is incorrect. [The accounting firm] never priced its services with respect to that formula. Why do I say that? Because there was a thorough review of the implications of contingent fees, the implications to an accounting firm, the AICPA rules, the local, you know, particular states rules with respect to accountancy, and it's my recollection that – well, percentage of the tax saving was never discussed with anyone where I was present with regard to any operations of [the Accounting Firm].

Q.     But [the Tax Solutions Group] never charged based on a percentage of tax savings?

(k)     A.     To my knowledge, never.

\* \* \* \* \*

Q.     And I just want to confirm that your earlier testimony is that [the Accounting Firm] never charged for its tax consultation as a percentage of tax savings, is that right?

(l)     A.     That's correct.

Q.     On page 21 of this Exhibit, there's a table titled "Profits From Tax Products." Do you know what "tax products" means in this context?

A.     I think – well, I'm just speculating. I didn't write this thing.

Q.     Apart from this, was the phrase "tax products" used at [the Accounting Firm] to refer to something?

(m)    A.    <u>All I can say is that is was used here.</u>

Q.    Okay. Have you seen it outside of this context?

A.    With other firms and in other places, yes.

Q.    But not at [the Accounting Firm]?

(n)    A.    <u>I mean, I don't recall.  I could have.  But the idea that, you know, your tax consulting services amount to a product like a piece of goods is silly.  It just isn't correct.  We were doing tax consulting services.  That's all we ever did.  And so there was no product.</u>

(Title 18, United States Code, Section 1623.)

## <u>FORFEITURE ALLEGATION</u>

49.    As the result of committing the conspiracy offense in violation of Title 18, United States Code, Section 371, alleged in Count One of this Information, CHARLES W. BEE, JR., the defendant, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offense, including but not limited to the following:

a.    At least $20,000,000 in United States currency, in that such sum represents proceeds CHARLES W. BEE, JR., obtained as a result of the conspiracy to commit the wire fraud offense contained in Count One, for which BEE is liable;

b.    All that lot or parcel of land, together with its buildings, appurtenances,

improvements, fixtures, attachments and easements, located at 17162 Avenue Le Rivage, Boca Raton, Florida 33496, more particularly described as a single-family residence;

      c.     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 21732 Marigot Drive, Boca Raton, Florida 33496, more particularly described as a single-family residence;

      d.     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 23322 Treeline Drive, Boca Raton, Florida 33428, more particularly described as a single-family residence;

      e.     All that lot or parcel of land, together with its buildings, appurtenances, improvements, fixtures, attachments and easements, located at 12 William Street, Saddle Brook, New Jersey 07663, more particularly described as a single-family residence; and

      f.     A 2006 Coach Legend 40' Recreational Vehicle.

## <u>SUBSTITUTE ASSET PROVISION</u>

      50.     If any of the above-described forfeitable property, as a result of any act or omission of the defendant:

      (1) cannot be located upon the exercise of due diligence;

      (2) has been transferred or sold to, or deposited with, a third person;

      (3) has been placed beyond the jurisdiction of the Court;

      (4) has been substantially diminished in value; or

(5) has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the above forfeitable property.

LEV L. DASSIN
Acting United States Attorney

\* Filed Waiver of Indictment + Information

5-28-05

Deft. pres. with attorney Mr. Abensohn, A.U.S.A Ms. Davis pres. Deft. arraigned + Plead Not Guilty.

Pitman
U.S.M.J